Agnes, Peter W., J.
1. Introduction
This is a civil action in which the plaintiffs allege that they suffered damages as a result of the negligence of a laboratory technician employed by the defendant Health Alliance Hospitals, Inc. who tested a throat culture taken from plaintiff Silvia Jimenez on or about July 28, 2000 and reported to Emergency Room staff who had treated Silvia for a sore throat that it contained a microorganism known as Neisseria gonorrhoea, a bacterium that when found in a child’s throat is associated with sexual abuse. However, after the isolate of the lab test in question was sent to the University of Massachusetts lab for confirmatory testing it was found to be a different and harmless species of Neisseria bacteria known as Neisseria sicca. Meanwhile, in the intervening twelve days from when the initial report was made to when the confirmatory tests were completed and communicated to medical staff and others, plaintiff Gaston D. Jimenez became the target of an investigation into suspected child sexual abuse.
2. Background
The plaintiff Gaston D. Jimenez was born in Ecuador in 1959. He completed a university program there in Chemical engineering. In Ecuador, he was employed in a national business involving hydrocarbons. He married plaintiff Ruth Jimenez in Ecuador and there the couple had two children. His older daughter, plaintiff Maria Jimenez was attending college in Pennsylvania and his younger daughter, plaintiff Silvia Jimenez lived at home with her parents. The family came to the United States in the 1990s. Initially, the family lived in Queens, New York where Gaston was employed as a factory worker. The family later moved to Worcester County.
*174 3.
On July 28, 2000, Gaston brought Silvia to one of the defendant Health Alliance hospitals because of her persistent complaints about a sore throat and the presence of a fever. The plaintiffs did not have a primary care physician at the time of these events. This was their first visit to a hospital in the United States. The plaintiffs traveled to the Washusett Emergency Room where Silvia was examined by Physician’s Assistant Karen Bishop. After a physical examination which revealed no abnormal signs other than a sore throat, P.A. Bishop gave Gaston a prescription for Silvia for an antibiotic (amoxicillin) and ordered a throat culture to determine if the source of the infection was bacterial. P.A. Bishop suspected the child had a streptococcus infection which was the most common type of bacterial infection which produced sore throat symptoms. She neither requested nor expected a result indicating the presence of a sexually transmitted disease (STD) organism like Neisseria gonorrhea. When she received the results of the initial lab test reporting gonorrhea, she filed a report as required by G.L.c. 119, §51 A.
4.
A few days after the initial hospital visit, Gaston received a telephone call to bring his daughter back to the hospital. By this time, Silvia was feeling better. Through an interpreter, Gaston was told that his daughter had tested positive for gonorrhea. He was not informed that the test results were preliminary, tentative or subject to confirmation. Gaston was not given the test results or any written reports. He was told to await the arrival of personnel from the Department of Children and Families (“DCF”).[1] Gaston met with Fitchburg Police Officers and representatives of DCF. He was informed that the only way that Silvia could have acquired this infection in her throat was sexual contact with an infected person. Gaston telephoned his wife and asked her to come to the hospital with their other daughter. Gaston was told he would have to be tested.
5.
The plaintiffs cooperated fully with DCF investigators and the hospital including submitting to testing and allowing the children to be given careful physical examinations for the presence of any indicators of sexual or physical abuse. Gaston was told he would have to remain at the hospital. The children, Silvia and Ruth, received doses of a strong antibiotic. Both children were admitted to the hospital and remained there until August 3, 2000. Gaston was informed by the authorities that he could have no contact with his daughters until further notice. Between the initial report that Silvia had an STD and August 13, 2000 when Gaston was informed by a doctor at the defendant’s hospital that there was no indication of an STD, Gaston and his wife Ruth suffered a loss of intimacy, and experienced symptoms of depression and anxiety.[2]
6.
One of the witnesses for the plaintiff was Dr. Rocco J. Perla, an epidemiologist and section head of Clinical Microbiology and Diagnostic Immunology for the defendant Health Alliance Hospitals. Dr. Perla has a Ph.D. in Science and Education and a post-graduate degree with a focus on infectious disease. He began his employment with the defendant before the events of this case, but worked in a separate section from microbiology lab where the testing that was the subject of this case was done. He described himself, without objection, as the person working for the defendant with the most knowledge uf the testing activities involved in this case. In a case involving an order for a throat culture in which there is no suspicion of or specific request to test for an STD, like this case, the swab is transmitted to the Central Processing department of the microbiology lab to insure there is a proper order and a specimen for testing. The swab is then brought to the lab where the specimen is “plated.” This is a process by which any microorganisms present in the specimen are placed in an environment which promotes their growth to enable technicians to identify them by either visual means or microscopically or both.
7.
According to Dr. Perla, plating a throat culture in a case such as this means rubbing the swab over a solid media in a Petri dish and then maintaining the dish under certain constant environmental conditions for a specific period of time. Two different types of media were used in this case — blood agar and chocolate agar. After 24 and then 48 hours, the plates are examined visually by technicians who are trained to recognize various types of colonies of bacteria. “And so, if we see something we recognize as a pathogen, at that point we can do biochemical testing and other types of testing.” Trial Transcript at 10, attached to plaintiffs’ motion (hereafter, “TT”).
8.
Bacteria in the genus or family known as Neisseria, the type of bacteria involved in this case, do not grow on blood agar, but may grow on chocolate agar. TT. 12. There are many (perhaps hundreds) of species of bacteria which are in the genus Neisseria. TT. 13. “Whenever a microbiologist has a suspicion that a potential pathogen may be in front of them on a plate, they will do testing to give them a better idea of what it is they’re dealing with. So, in dealing with Neisseria species, there are some tests that would be performed;[3] but here, as it says, after that testing was done — again, I have no direct knowledge of that specific testing that was done in this case — Neisseria gonorroheae was identified, and then sent, the isolate was sent to the University of Massachusetts for confirmatory testing.” TT. 16-17. Dr. Perla testified that *175 the testing report for plaintiff Silvia Jimenez identifies that the lab technician was Ms. Tracy Snowden, a medical technologist with an undergraduate and masters degree,[4] who at the time was serving as the head of the microbiology lab.
9.
Dr. Perla explained that the species of Neisseria bacteria ultimately found to have been present in the throat culture from Silvia Jimenez, Neisseria sicca, is regarded as not disease causing and is “often considered to be a normal inhabitant of the upper respiratory tract.” TT. 22. He further indicated that the method used by microbiology labs to differentiate between pathogenic and relatively non-pathogenic species of Neisseria include biochemical tests to measure the response of the colony to different types of sugars. TT. 25. The lab report in this case, exhibit 1, does not indicate whether such tests were performed, but this is not something that usually appears in the report that is given to the clinician. TT. 25-26. Dr. Perla had no knowledge of whether any such biochemical testing was performed on the plated culture involved in this case. TT. 27.
10.
Dr. Perla explained that typically the treating clinician is informed of test results for a pathogenic bacterium like Neisseria gonorrhea as a result of a telephone call from the lab. Such a result in a throat culture from a three-year-old girl would be regarded by all as “concerning.” TT. 28. According to the lab report the result — a finding of the presence of Neisse-ria gonorrhea — is listed as “Status-Final.” TT. 29.[5]
11.
The plaintiffs offered evidence of the standards and testing procedures used by the defendant’s microbiology lab for throat cultures at the time of the events in this case. According to exhibit 7, which was signed or initialed by the laboratory administrator (who at the time was Tracy Snowden, the technician who actually performed the tests) and the medical director, there are two categories of bacteria — non-pathogenic and possible pathogens. TT. 34-36. Neisseria species is listed in the non-pathogenic category. Neisseria gonorrhea is not listed at all. In addition, on page 2 of the procedures (exhibit 7), there is a note as follows: “If Neisseria gonorrhoeae is suspected, Thayer Martin or JEMBEC should be innoculated immediately. See the procedure for the isolation of Neisseria gonorrhoeae.” TT. 37 Dr. Perla agreed that the last sentence of the note was put in italics “for emphasis.” TT. 37. According to Dr. Perla, JEMBEC is a media “selected for Neisseria gonorrheae. It contains agents that will suppress the growth of other microorganisms, that can get in the way and confound interpretation.” TT. 38. Dr. Perla further explained that the importance of using the JEMBEC media to grow any colonies of Neisseria gonorrhea is that Neisseria gonorrhea and Neisseria sicca resemble each other and thus the presence of both species could make an identification of the presence of pathogenic bacteria difficult. TT. 38-39. Dr. Perla was unable to point to anything in the record to indicate that the throat sample from Silvia Jimenez was plated on JEMBEC media. TT. 39.[6]
12.
Dr. Perla also explained the defendant’s policy or procedure for isolating Neisseria gonorrhea that was applicable at the time of the events in this case. The policy was received in evidence as exhibit 8. It indicates that “proper specimen collection and transport” are essential because this organism, has special growth requirements and is “fastidious as to temperature.” TT. 41. For example, the plate should come to room temperature before introducing the specimen and it should not be placed in the refrigerator. TT. 41. When asked how a positive result could have been reached for the presence of Neisseria gonorrhea in this case if the procedures outlined in exhibit 8 were not followed, Dr. Perla testified that he had no knowledge of what procedures were followed, and added that sometimes, even when correct procedures are not followed, the pathogenic bacteria will nonetheless grow. TT. 43-44. However, Dr. Perla did testify that when a laboratoiy technician examines a plated specimen and suspects the presence of Neisseria gonorrhea the correct procedure is to invoke the special procedures set forth in exhibit 8. TT. 44. He also explained a difference between the lab procedures for throat cultures (exhibit 7) and the special procedures for Neisseria gonorrhea (exhibit 8) in terms of reporting results. In cases involving suspected Neisseria gonorrhea, the lab procedure states that if there is no growth reported after 48 hours, report “no Neisseria gonorrhea isolated.” However, if Neisseria gonorrhea is present, indicate the quantity and the result of the beta-lactamase test. TT. 47. Finally, exhibit 8 adds that all positive tests results for Neisseria gonorrhea must be reported to the physician immediately.
13.
There is no provision made in the defendant’s lab procedures placed in evidence in this case (exhibits 7 and 8) for presumptive or tentative findings of Neisse-ria gonorrhea to be reported pending confirmatory test results. The only procedure calls for the immediate report of a positive finding of Neisseria gonorrhea based on the use of the JEMBEC medium.
14.
The plaintiffs also offered testimony from Dr. Evangelista who was serving as the medical director of a major national pharmacology company and who was a Diplomat of the American Board of Microbiology. He opined that the initial report made by the defendant’s lab of the presence of Neisseria gonorrhea was improper because such results cannot be obtained without two confirmations — a visual determi *176 nation and biochemical testing. Dr. Evangelista explained that Neisseria gonorrhea turns only one sugar into glucose whereas Neisseria turns any of four sugars into glucose. Furthermore, Dr. Evangelista testified that unless a lab uses a selective media like JEMBEC, there is a very high risk of false positives when you are dealing with a sample taken from a non-genital area of the body as in this case. According to Dr. Evangelista, using a chocolate agar plate to grow a specimen and then on that basis to make a determination of the presence of Neisseria gonorrhea was below the applicable standard of care. See exhibit 12 (excerpt from the Manual for Microbiology written by the witness and in widespread use throughout the United States). The conduct of the lab technician in this case, according to Dr. Evangelista, should have reported “Neisseria species — exact one to be determined.” The lab technician’s shortcoming, he explained, was not in using a chocolate agar plate, but in not doing the further testing required by its own procedures before reporting a final result.
15.
The defendant’s case rested principally on the testimony of Dr. Manlio LoConte, the Chief of Pathology and Director of labs at Saints General Hospital in Lowell. He opined that the procedures established for use by the defendant in their microbiology lab (exhibits 7 and 8) were appropriate and that proper procedure was followed in plating the plaintiff Silvia Gaston’s throat culture. Dr. LoConte’s opinion was that Neisse-ria gonorrhea can grow in a chocolate agar media and because the result was based on a non-genital sample, it had to be sent out to another lab for confirmation. Dr. LoConte’s opinion was that the lab result in this case should be regarded as an “initial” finding because why else would it be sent out for confirmation.
16.
At the close of the plaintiffs case, the only motion that was filed was a motion by the defendant for a directed finding. The jury returned a verdict for the defendant after about 11/2 days of deliberation.
II. Discussion
17. Legal Standard Governing Motions for a New Trial.
Rule 59(a)(1) of the Massachusetts Rules of Civil Procedure “permits the granting of a new trial in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the Commonwealth.” See Galvin v. Welsh Mfg. Co., 382 Mass. 340, 342 (1981). “It is doubtful whether any rule of practice has been more frequently stated than the general rule that the granting or refusal of a new trial on the ground that the verdict is against the weight of the evidence rests in the discretion of the judge.” Perry v. National Man. Bank of Lynn, 315 Mass. 653, 657 (1977). “In ruling on such a new trial motion the judge must necessarily consider the probative force of the evidence and not merely the presence or absence of any evidence upon the disputed point.” Gaston Snow & Ely Bartlett, 404 Mass. 515, 520, cert. den., 493 U.S. 894 (1989) (quotations omitted). The role of the trial judge in acting on a motion for a new trial in a case such as this was more precisely articulated by the Supreme Judicial Court in Hartman v. Boston Herald-Traveler Corporation, 323 Mass. 56, 59-60 (1948) (citations omitted):
When a trial judge is called upon to determine whether a verdict is against the weight of the evidence, the question before him, under the practice in this Commonwealth, is by no means the same as that presented to him at the trial when a motion is made for a directed verdict. The judge can direct a verdict for one of the parties only when there is no evidence, more than a mere scintilla, upon which a verdict for the other party could rest. When some evidence worthy of consideration is present the judge must submit the case to the juiy, even though it may appear to him that the preponderance of the evidence on one side is so great that he would set aside a verdict rendered against such preponderance. But when asked to set aside a verdict as against the weight of the evidence the judge must necessarily consider the probative force of the evidence and not merely the presence or absence of any evidence upon the disputed-point. In a limited sense he decides a question of fact. He is limited because he ought not to decide solely on his own opinion of the weight of the evidence as if he had heard the case without a juiy. He may set aside the verdict only if he is satisfied that the juiy have failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law. However, the process of applying this standard is deemed to be an exercise of discretion by the trial judge, and when the case reaches this court we can disturb his action only if we in turn are satisfied that he has abused his discretion.
See also W. Oliver Tripp Co. v. American Hoechst Co., 34 Mass.App.Ct. 744, 748 (1994) (“The standard that a trial judge is to apply on a motion for a new trial in a civil case is whether the verdict is so markedly against the weight of the evidence as to suggest that the jurors allowed themselves to be misled, were swept away by bias or prejudice, or for a combination of reasons, including misunderstanding of applicable law, failed to come to a reasonable conclusion”).
18. Assessment of the Weight of the Evidence.
The jury’s determination that the defendant’s employee was not negligent is clearly against the weight of the evidence. This court is mindful of the admonition issued by the Supreme Judicial Court that the trial judge is not permitted to make a decision based solely on the court’s own opinion of the y/eight of the evidence as if the case had been tried without a jury. Instead, the court may set aside the verdict only if it *177 is satisfied that the jury “failed to exercise an honest and reasonable judgment in accordance with the controlling principles of law.” Hartman v. Boston Herald-Traveler Corporation, supra, 323 Mass. at 60. The witness with the most knowledge about the operation of the microbiology lab at the defendant’s hospital was Dr. Perla. A fair reading of his testimony is that it supported the plaintiffs theory in every respect except that he reserved judgment on the question of whether Tracy Snowden had not followed established procedures as set forth in exhibits 7 and 8 and that as a result, her conduct fell below the applicable standard of care due to the fact that Dr. Perla did not know whether Ms. Snowden had performed any additional confirmatory tests after seeing evidence of Neisseria colonies on the chocolate agar plate. However, when the testimony of Dr. Perla is read in light of the testimony of Dr. Evangelista, a clear picture emerges that points clearly in the direction of Tracy Snowden’s negligence. There is no reason to believe that a differentiation between Neisseria gonorrhea and Neisseria sicca can be made by visual inspection alone. The strong weight of the evidence from the testimony of Dr. Perla and Dr. Evangelista, uncontradicted by the testimony of Dr. LoConte, is that such a differentiation is not possible. In light of the fact that the specimen from Silvia Jimenez was not accompanied by a physician’s request to check for Neisseria gonorrhea, but instead accompanied a routine examination for a sore throat, and thus had been incubated on a chocolate agar plate should have put Tracy Snowden on high alert about the potential for a false positive.
19.
The absence of any evidence that Tracy Snowden used the JEMBEC media to confirm her suspicion or belief that she had cultured Neisseria gonorrhea does not support a determination that she acted reasonably. There is no indication anywhere in the evidence that lab results from the defendant’s microbiology lab would be sent to the University of Massachusetts for any reason other than for confirmation of a result reached by the defendant’s lab. Since there is no indication of any unusual finding or complicating factor in connection with the analysis performed by Tracy Snowden, the only reasonable inference to draw from the evidence is that Tracy Snowden did not perform the confirmatory tests for the presence of Neisseria gonorrhea that she had the capacity to do in house, but instead sent the isolate to the University of Massachusetts lab for confirmation. This might be regarded as reasonable if no “final” results was issued, but it does not explain Tracy Snowden’s decision to simultaneously report her results as “final” to the medical staff. I weigh heavily the testimony of Dr. Evangelista to the effect that it is established in the field of microbiology that when you test for Neisseria gonorrhea from a non-genital site without using a selective media designed for such a test, there is a very high risk of a false positive. Correspondingly, far less weight should be given to the testimony of Dr. LoConte which seemed rooted in the undisputed fact that Neisseria gonorrhea could be grown in a chocolate agar media. That was not the issue in this case. Rather, the question was whether Tracy Snowden breached the applicable standard of care by relying on her visual observation to advise the medical team of the presence of Neisseria gonorrhea.
20.
This court takes judicial notice of G.L.c. 119, §51A. Tracy Snowden knew or should have known that a report transmitted in the form she used would trigger a response that would have a major, adverse effect on the plaintiffs, especially because the people to whom Tracy Snowden reported enjoyed immunity from good faith actions taken in connection with reports of child abuse. The very strong weight of the evidence, therefore, points to the plaintiffs and away from a verdict for the defendant.
21. Instructions of Law.
The court’s juiy instructions included, in part the following:
In considering whether the defendant’s lab personnel breached the duty of care owed to Gaston and Ruth Jimenez you should consider that Massachusetts law, as set forth in Chapter 119, section 51A, provides that any lab technician employed by the defendant “who, in his professional capacity shall have reasonable cause to believe that a child under the age of eighteen years is suffering physical or emotional injury resulting from abuse inflicted upon him which causes harm or substantial risk of harm to the child’s health or welfare including sexual abuse, or from neglect, . . . shall immediately report such condition to the department [of social services] by oral communication and by making a written report within forty-eight hours after such oral communication . . . Any such person so required to make such oral and written reports who fails to do so shall be punished . . .”
Under this law, medical personnel, including a lab technician employed by the defendant, must act reasonably and in accordance with the applicable standard of care. If such a person complies with the applicable standard of care, Massachusetts law provides further that the lab technician is not “liable in any civil or criminal action by reason of such report if it was made in good faith.” The question in this case is whether the defendant’s lab technicians violated the applicable standard of care based on the manner in which they tested Silvia’s throat culture and reported their results.
22.
The instruction quoted above in paragraph (21) could have misled the jury to believe that it was reasonable under the circumstances of this case for *178 Tracy Snowden to suspect that the specimen in question contained Neisseria gonorrhea and that her decision to report it while at the same time sending it for confirmation was an act taken in good faith and thus an act for which no liability could attach. The plaintiffs opposed the instruction as given. While the court is of the view that G.L.c. 119, §51A has application in this case, as explained in the above charge, the jury may not have understood that the determination of whether there was a breach of the duty of care on the part of Tracy Snowden did not reduce to simply whether she acted in good faith. The jury was required first to decide whether Tracy Snowden complied with the standard of care governing the conduct of the tests she performed. There was ample evidence from the plaintiffs’ experts and the lab procedures in question that established that a visual and a biochemical test was necessary to confirm the presence of Neisseria gonorrhea and that a report to the medical team of the presence of Neisseria gonorrhea, without any qualification such as the one suggested by Dr. Evangelista (“Neisseria species — exact one to be determined”) was conduct that fell below the applicable standard of care.
ORDER
For the above reasons, after a careful review of the trial proceedings and thoughtful deliberation, this Court is left with the conviction that the verdict for the defendant “is so markedly against the weight of the evidence as to suggest that the jurors allowed themselves to be misled, were swept away by bias or prejudice, or for a combination of reasons, including misunderstanding of applicable law, failed to come to a reasonable conclusion.” Scannell v. Boston Elev. Ry., 208 Mass. 513, 514-15 (1911).[7] Accordingly, the plaintiffs’ motion for a new trial is ALLOWED.

At the time of the events in this case, the Department of Children and Families (DCF) was known as the Department of Social Services (DSS).

The plaintiffs also relied on testimony by a board certified psychiatrist, Dr. Romero, who examined the plaintiff Gaston and plaintiff Ruth in November 2000 and who diagnosed the plaintiff Gaston for loss of sexual functioning as suffering from Post-Traumatic Stress Disorder.

Dr. Perla testified about several tests that are typically performed to identify whether the colony on the plate consists of bacteria in the genus Neisseria These include looking at the colony’s growth pattern, a gram stain, a microscopic examination, and an oxidase test. TT. 19-21. However, the results of these tests do not allow the technician to differentiate between species of Neisseria because all the species of that genus have the same “general characteristics.” TT. 21, 22-23. See Exhibit 1.

Tracy Snowden did not testify at trial. The evidence indicated that she no longer worked for the defendant and her whereabouts was unknown. TT. 25, 34-35, 51.

Dr. Perla was unable to say what procedures were in place in the defendant’s microbiology lab in July 2000 for the review of test results like the one in this case, but did acknowledge, without objection, that under the procedures in place at the time of the trial, a result of Neisseria gonorrhea would have to be reviewed by the medical director of the laboratory “who is a pathologist.” TT. 33.

The laboratory procedure for performing throat cultures applicable to the sample in this case, exhibit 7, also contains a note on page three that the lab should be notified in advance if Neisseria gonorrhea is suspected because “[slpecial collection or procedures are necessary for the isolation of these organisms.” See TT. 39-40.

I find the alternative arguments advanced by the plaintiff to be lacking in merit. These include the court’s decision to seat certain jurors and the court’s instructions on the second day of deliberations about the desirability of a decision if one can be reached without any juror giving up his or her opinions honestly held. Also, for the reasons stated by the defendant, this is not a case where it is appropriate to consider a motion for judgment notwithstanding the verdict.